1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JULIA LANGLEY,                          No. 1:16-cv-01133-DAD-JLT

12                   Plaintiff,

13          v.                               ORDER GRANTING DEFENDANTS'
                                             MOTION FOR SUMMARY JUDGMENT
14   COUNTY OF INYO, et al.,
                                             (Doc. No. 39)
15                   Defendants.

16

17          Before the court is the motion for summary judgment, or in the alternative partial

18   summary judgment, filed by defendants County of Inyo ("Inyo County" or "the County") and

19   Margaret Kemp-Williams ("Kemp-Williams") (collectively, "defendants") on September 18,

20   2018.  (Doc. No. 39.)  A hearing on this motion was held on November 6, 2018.  Attorney John

21   Sarsfield appeared telephonically on behalf of plaintiff Julia Langley ("plaintiff") and attorney

22   Carl Fessenden appeared telephonically on behalf of defendants.  Following the hearing, the

23   motion was taken under submission.  For the reasons set forth below, defendants' motion will be

24   granted.

25                                    **BACKGROUND**

26   **A.    Factual Background**

27          In late 2014, Inyo County opened a deputy county counsel position due to the voluminous

28   workload shared by then-County Counsel Kemp-Williams, and deputy county counsel David

                                               1

Nam. (Doc. No. 41-1 (defendants' reply to plaintiff's response to defendants' statement of undisputed facts, or "DSUF") at ¶ 1.) On December 5, 2014, plaintiff applied for that deputy county counsel position and submitted her resume, which listed over twenty years of experience as a deputy county counsel for Tulare County and background on specific matters that would be helpful to Inyo County. (DSUF ¶¶ 3, 4.) On December 15, 2014, a panel interviewed plaintiff and concluded that she was qualified for the position. (DSUF ¶¶ 5, 6.) Subsequently, Inyo County Administrator Kevin Carunchio approved plaintiff's appointment as the highest deputy level in the county counsel's office based on her background and experience. (DSUF ¶ 6.) Thereafter, Kemp-Williams extended a conditional job offer to plaintiff for the Deputy County Counsel IV position. (DSUF ¶ 6.) The job offer was contingent on plaintiff successfully completing a six-month probationary period. (DSUF ¶ 7.)

Plaintiff was also required to complete the Inyo County physical exam, which included the completion of a medical questionnaire and blood work. (DSUF ¶¶ 6, 8; Doc. No. 41-2 (defendants' response to plaintiff's statement of undisputed facts, or "PSUF") at ¶ 1.) Plaintiff objected to some aspects of that exam. (PSUF ¶ 2.) On December 29, 2014, plaintiff advised Kemp-Williams that she had concerns about filling out the medical questionnaire. (DSUF ¶ 9.) Kemp-Williams advised plaintiff that she did not have to complete the questionnaire. (DSUF ¶ 10.) On the date of her physical, plaintiff texted Kemp-Williams regarding concerns with the blood work she was requested to have completed. (DSUF ¶ 11.) Kemp-Williams directed plaintiff to contact Sue Dishion, Inyo County Deputy Personnel Director, and provided her telephone number. (DSUF ¶ 12.) Ms. Dishion told plaintiff that she did not need to complete the blood work as a part of the physical exam. (DSUF ¶ 13.) After plaintiff was told that she neither had to complete the medical questionnaire nor do the blood work, plaintiff never voiced any further concerns about either issue. (DSUF ¶ 14.)

Plaintiff accepted the Inyo County Counsel IV position and agreed to start working on February 12, 2015. (DSUF ¶ 15.) She was supervised by Kemp-Williams. (DSUF ¶ 16.) Plaintiff was an experienced government attorney with no history of discipline. (PSUF ¶ 4.)

/////

According to defendants, Kemp-Williams began to have concerns about plaintiff's work product and performance within a few weeks after plaintiff started working for Inyo County and she documented her concerns in a March 6, 2015 memorandum. (DSUF ¶ 17.) Kemp-Williams read that memorandum at her meeting with plaintiff and Ms. Dishion on March 6, 2015 to discuss those deficiencies but informed plaintiff that the memorandum would not be placed in plaintiff's personnel file. (Doc. No. 39-4 at ¶ 13; DSUF ¶¶ 17, 20, 22.) Kemp-Williams' declaration lists what her primary concerns regarding plaintiff's work performance were at the time of that March 6, 2015 meeting.[1] (Doc. No. 39-4 at ¶ 13.)

In addition, Ms. Dishion declares that Kemp-Williams advised her in late February 2015 that she was having problems with plaintiff, including that plaintiff was not performing at the Deputy IV level, and that they discussed documenting the problems and discussing them with plaintiff. (Doc. No. 39-7 at ¶ 8.) Ms. Dishion further declares that on March 6, 2015, Kemp-Williams prepared a memorandum outlining plaintiff's performance issues, that they met with plaintiff that day to discuss those issues, and that at that meeting, Kemp-Williams read from her prepared memorandum as a starting point to discuss plaintiff's performance issues. (Doc. No. 39-7 at ¶ 8.) From defendants' perspective, the purpose of the meeting was to identify those issues,

/////

---

[1] The list of Kemp-Williams's primary concerns included: (a) her feeling that plaintiff was often insubordinate and failed to follow directions; (b) her observation that plaintiff failed to review information she referred plaintiff to regarding a HIPAA assignment, which subsequently resulted in plaintiff providing legal advice to a county agency that outside counsel viewed as incorrect; (c) her experience working with plaintiff on an MOU assignment, where she had to make significant revisions to plaintiff's work and plaintiff had failed to include indemnity language after being asked to do so; (d) her review of plaintiff's work product for a Grand Jury assignment, where plaintiff failed to state the official in question was a county officer, an important point in the assignment; (e) her review of plaintiff's work product on an assignment regarding Measure A, which, in her opinion, failed to discuss the issue in a meaningful way; (f) her experience redoing plaintiff's assignment where plaintiff was asked to provide a memo to the County board in layman's terms regarding the Adventure Trails petition because plaintiff's work product was overly legalistic; (g) her concern that plaintiff requested fourteen days in a petition to abate a nuisance, despite discussions with staff where plaintiff was told that fourteen days would not be long enough; (h) her feeling that plaintiff did not accept the decisions she made; and (i) her concern that plaintiff stated she was unwilling to work more than 40 hours a week unless there were exigent circumstances, which she limited to blood or fire. (DSUF ¶ 18; Doc. Nos. 39-4 at 3–4; 39-8 at 47–50.)

make sure plaintiff understood her employer's expectations, and to help her improve. (DSUF ¶ 21.)

According to plaintiff, she met with Ms. Dishion on March 6, 2015 "to further explain [her] concerns about the actions of defendant Kemp-Williams as well as to report [her] belief that defendant Kemp-Williams' actions were illegal in nature." (Doc. No. 40-3 at ¶ 6.) It is undisputed that plaintiff believed Kemp-Williams was both violating the law and was rude. (PSUF ¶ 5.) It is plaintiff's contention that the purpose of the meeting on March 6, 2015 was for her to complain about Kemp-Williams' illegal actions. (PSUF ¶ 6.) But rather than meet with Ms. Dishion and plaintiff "to try to resolve [plaintiff's] concerns, defendant Kemp-Williams instead prepared a lengthy memorandum detailing her subjective perceptions about [plaintiff's] alleged work-place deficiencies." (*Id.*) Plaintiff declares that Kemp-Williams' assessment of her workplace performance was incorrect, that defendants' allegations that she was somehow deficient in her work product and legal skills is incorrect, and that during the course of her employment with Inyo County, "[she] performed [her] legal duties competently and in accordance with [her] experience as an attorney of many years." (*Id.* at ¶¶ 6, 15.) Further, plaintiff declares that "the allegations that [she] was 'insubordinate' are false," and she "followed the lawful directions of [her] supervisor and client(s) that [she] was given to the best of [her] professional abilities." (*Id.* at ¶ 16.)

Defendants' version of the events regarding various county employees having observed deficiencies in plaintiff's work performance are as follows. Inyo County Risk Manager Marlena Baker, Ms. Dishion, and Mr. Carunchio had been approached by many county employees who had expressed their concerns over plaintiff's work performance. (DSUF ¶ 23.) Ms. Baker declared that other county staff members who interacted with plaintiff came to her and advised her that they were uncomfortable with plaintiff and questioned her competence, and that she was generally aware of the performance issues that Kemp-Williams had with plaintiff. (Doc. No. 39-6 at ¶ 6.) On February 20, 2015, Ms. Baker had observed plaintiff's deficient work performance in the same HIPAA assignment that concerned Kemp-Williams, in which plaintiff prepared a memorandum authorizing release of confidential medical information of a former behavioral

4

health client to an out-of-state coroner. (DSUF ¶ 19.) Ms. Baker hired outside counsel to analyze the issue and provide advice, and it was discovered that plaintiff's error was in failing to consider more stringent privacy standards applicable under state law. (*Id*.) Plaintiff's mistake significantly strained relationships with the county client and required Inyo County to take steps to notify the decedent's representative of the breach. (*Id*.) When confronted with the outside counsel's advise showing her error, plaintiff continued to maintain that she was correct. (*Id*.)

Ms. Dishion declared that after her meeting with plaintiff and Kemp-Williams on March 6, 2015, other county managers expressed concerns to her about plaintiff's job performance, and Kemp-Williams advised her that there were ongoing problems with plaintiff's performance as well. (Doc. No. 39-7 at ¶ 9.) Ms. Dishion communicated her ongoing concerns about plaintiff's work performance to Mr. Carunchio. (*Id*. at ¶ 10.) Kemp-Williams documented plaintiff's ongoing performance deficiencies throughout April and May 2015 in a second memorandum dated June 6, 2015, which she later provided to plaintiff and Mr. Carunchio.[2] (Doc. No. 39-4 at ¶ 14; DSUF ¶ 25.)

Mr. Carunchio continued to receive complaints about plaintiff's performance throughout the entirety of her employment with Inyo County. (DSUF ¶ 24.) Inyo County Health and Human Services Director Jean Turner provided a negative impression of plaintiff based on her medical marijuana presentation to the Board of Supervisors, finding her presentation to be more about

---

[2] Kemp-Williams' declaration provides the following examples of performance issues that she documented in her second memorandum: (1) part of plaintiff's role was to review agenda items for Board meetings, and she misstated the amount of money being requested in a Board agenda item, showing plaintiff's lack of attention to detail; (2) on an ESCOG assignment, which involved searching for copies of creation documents, plaintiff failed to communicate to Kemp-Williams that by laws existed, resulting in incorrect information being provided to a Board member; (3) plaintiff did not initially research an alternative theory for that ESCOG assignment; (4) plaintiff provided discouraging remarks to Kemp-Williams on the morning of her Ethics presentation, calling her PowerPoint presentation "very dense" and plaintiff referenced a presentation she brought with her from Tulare County that would have been "easy for the board to follow;" (5) plaintiff failed to complete the requested research on an assignment regarding dual use roads; (6) plaintiff refused to prepare a CEQA presentation due to not having a canned presentation and lack of time, despite having fourteen days to prepare the presentation; and (7) plaintiff's presentation to the Board on the issue of medical marijuana received negative comments and failed to provide the Board with options to consider in its decision-making. (DSUF ¶ 26; Doc. No. 39-4 at ¶ 14.)

passion than providing neutral overview of the law. (DSUF ¶ 27.) Ms. Turner advised that she would be cautious when relying on work product from plaintiff based on that presentation. (*Id.*) Mr. Carunchio had also observed plaintiff present to the Board on the topic of medical marijuana and felt plaintiff failed to present an unbiased legal overview of the topic, which came across as unprofessional and not the work product he expected from a Deputy County Counsel IV. (DSUF ¶ 28.) Mr. Carunchio was also approached by Kelly Williams, Assistant to the County Administrator, who worked with plaintiff on a grant contract for the office of emergency services and identified significant errors made by plaintiff in that contract. (DSUF ¶ 29.) Ms. Williams told Mr. Carunchio that she felt like plaintiff was asking her to do legal work. (*Id.*)

Plaintiff does not argue that she has a different version of those events or address any of the specific examples of her alleged performance deficiencies during her time with Inyo County. Plaintiff's perspective is as follows. Plaintiff was having problems with Kemp-Williams's management style and personality and believed Kemp-Williams violated the law and was rude. (PSUF ¶ 5; DSUF ¶ 30.) Kemp-Williams engaged in outbursts in the office.[3] (PSUF ¶ 7.) On May 12, 2015, Kemp-Williams stated that she resented employees who took sick time, and plaintiff took that statement as a threat to her job. (PSUF ¶ 8.) Plaintiff suffered from migraines and Kemp-Williams was aware of this. (PSUF ¶ 9.) On May 13, 2015, plaintiff sent Ms. Dishion an email regarding problems she was having with Kemp-Williams' management style and personality. (DSUF ¶ 30.) On May 14, 2015, plaintiff sent Ms. Baker an email outlining her complaints against Kemp-Williams. (DSUF ¶ 31.) On May 14, 2015, plaintiff met with Ms.

/////
/////
/////
/////
/////
/////

---

[3] Defendants object to this fact as being immaterial, but do not explicitly dispute it.

Dishion and Ms. Baker to engage in an interactive process.[4]  (PSUF ¶ 10.)  At that meeting, Ms.

Dishion told plaintiff that she would not be retaliated against by Kemp-Williams.  (PSUF ¶ 11.)

In response, Inyo County consulted outside legal counsel and initiated a personnel investigation regarding plaintiff's complaint against Kemp-Williams.  (DSUF ¶ 32.)  During that investigation, Inyo County physically separated the work locations of plaintiff and Kemp-Williams.  (DSUF ¶ 33.)  The investigation was completed on July 15, 2015, and the conclusions were reported to Inyo County.  (DSUF ¶ 34.)  On July 21, 2015, Ms. Dishion advised plaintiff that her complaints against Kemp-Williams were determined to be unfounded and without merit.  (PSUF ¶ 13; DSUF ¶ 35.)  Nine days after learning the results of the investigation, plaintiff was fired, and no reason was given for the firing.  (PSUF ¶¶ 14, 15.)

With respect to Inyo County's decision to terminate plaintiff's employment, defendants assert the following facts.  With regards to probationary employees, the department head usually makes a recommendation to Mr. Carunchio whether to make an offer of permanent employment, or not.  (DSUF ¶ 40.)  Because of plaintiff's complaint against her department head, Kemp-Williams, Mr. Carunchio decided to independently assess the issue of plaintiff's probationary status.  (*Id*.)  Mr. Carunchio requested Ms. Baker and Ms. Dishion conduct a review of plaintiff's work performance and make a recommendation regarding her probationary status.  (DSUF ¶ 41.)  Ultimately, Ms. Baker and Ms. Dishion submitted a memorandum to Mr. Carunchio recommending that plaintiff's probationary status be terminated.  (DSUF ¶ 42.)  On July 30, 2015, Mr. Carunchio made the decision to terminate plaintiff's probationary status.  (DSUF ¶ 43.)

/////

---

[4]  The purpose of that May 14, 2015 meeting is disputed by the parties.  Plaintiff contends the purpose of that meeting was for her to report her belief that Kemp-Williams had violated the law.  (PSUF ¶ 10.)  Defendants contend that the purpose of the meeting was to determine whether any reasonable accommodation relating to plaintiff's headaches and missed work was necessary, but defendants assert that the dispute about the purpose of the meeting is not material.  (DSUF ¶ 37; Doc. No. 39-7 at ¶ 12.)  It is undisputed that plaintiff was provided all accommodations she requested with respect to her headaches and missing work.  (DSUF ¶ 38.)  It is also undisputed that plaintiff met with Ms. Baker (the ADA coordinator) and Ms. Dishion again in mid-June to discuss whether plaintiff needed any additional accommodations due to missing a substantial amount of work, and plaintiff did not request any additional accommodations at that time.  (DSUF ¶ 39.)

Mr. Carunchio's decision to terminate plaintiff's employment was based solely on information gathered from multiple sources, his own personal observations of plaintiff, and a review of plaintiff's deficient work products.[5] (DSUF ¶ 45.) Plaintiff's complaint about being required to fill out a medical questionnaire and completing blood work, prior to accepting her employment offer with Inyo County, played no role in his termination decision. (DSUF ¶ 46.) Plaintiff's complaints relating to Kemp-Williams also played no role in his decision. (DSUF ¶ 46.)

**B.      Procedural Background**

On November 17, 2016, plaintiff filed the operative, second amended complaint ("SAC"). (Doc. No. 17.) In her SAC, plaintiff asserted two causes of action: (i) a claim against Kemp-Williams under 42 U.S.C. § 1983, based on retaliation in violation of plaintiff's First Amendment

---

[5]  Mr. Carunchio's declaration provides the following bases for his decision to terminate plaintiff's probationary employment: (i) consistent and similar complaints of county employees regarding plaintiff's deficient performance; (ii) his own observations, along with the observations of Ms. Baker, Kemp-Williams, Ms. Dishion, Ms. Turner, Ms. Williams, the Board of Supervisors, and other county employees regarding plaintiff's deficient work performance and unprofessional behavior; (iii) reviewing numerous work assignments demonstrating plaintiff's inability to follow instructions, prepare accurate and reliable work product, and respect various levels of supervision, as described by Ms. Baker, Kemp-Williams, Ms. Williams, and other county employees; (iv) he had been advised that plaintiff was told that she provided incorrect legal advice on the HIPAA matter and thereafter maintained she was correct, despite being presented with information showing her error; (v) his personal observations of plaintiff's medical marijuana presentation to the Board of Supervisors, where she failed to present an unbiased legal overview of the matter and his finding that her presentation was unprofessional and fell well below the expectations of an experienced county counsel; (vi) he had learned that plaintiff's work product provided the underlying basis for a presentation to the Board of Supervisors analyzing the demands of California's Fair Political Practices Commission on public employees, and it was his understanding that plaintiff's work product contained incorrect information, which resonated poorly with the Board members, and she failed to revise her work product in light of research provided by Kemp-Williams that conflicted with the information provided in plaintiff's original work product; (vii) his knowledge that plaintiff had failed to complete assignments; (viii) he had been advised that plaintiff failed to calendar or propound discovery on a tax litigation matter against Verizon, which in his opinion, demonstrated her inability to perform basic legal tasks and a lack of attention to details; (iix) complaints he received about plaintiff relying on "canned" work product, resisting certain assignments deemed "pure law" assignments, and making comments that her superiors found disrespectful; (ix) he learned that plaintiff had been repeatedly contacting former Tulare County Counsel colleagues to obtain legal advice on Inyo County assignments and requesting that the colleagues provide her their work product or documents, and numerous emails were found, which demonstrated that plaintiff was not competent in performing at the level of a Deputy County Counsel IV. (DSUF ¶ 44; Doc. No. 39-5 at ¶ 17.)

8

rights, and (ii) a claim against Inyo County under the Fair Employment and Housing Act ("FEHA"), California Government Code § 12900 *et seq*., for retaliation. (*Id*.)

On September 18, 2018, defendants filed the pending motion for summary judgment. (Doc. No. 39.) On October 23, 2018, plaintiff filed an opposition to the motion for summary judgment. (Doc. No. 40.) On October 30, 2018, defendants filed a reply to plaintiff's opposition. (Doc. No. 41.)

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, as plaintiff does here, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of

summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party, *see Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## DISCUSSION

**A.** **First Amendment Retaliation Claim**

"The First Amendment's guarantee of freedom of speech protects government employees from termination *because of* their speech on matters of public concern." *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996). As the Ninth Circuit has explained:

> A First Amendment retaliation claim against a government employer involves a sequential five-step series of questions: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Desrochers v. City of San Bernardino*, 572 F.3d 703, 708–09 (9th Cir. 2009) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)); *see also Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1259 n.2 (9th Cir. 2016) (noting that "while *Eng* delineates the burden of proof at trial, courts must be 'mindful of the shifting burden of proof governing motions for summary judgment under Federal Rule of Civil Procedure'") (citing *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)). The Ninth Circuit has clarified that all five *Eng* factors, though previously described as "sequential," are independently necessary and "failure to meet any one of them is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 (9th Cir. 2013). Courts do not have to go through the *Eng* factors in order, and "it may be more efficient in some instances to answer a potentially dispositive question further down the *Eng* list first." *Id.* at 1067 n.4; *see also Desrochers*, 572 F.3d at 709 (affirming district court's grant of summary judgment following limited review of public concern inquiry "[b]ecause the district court concluded that [plaintiffs'] speech did not touch on matters of public concern, [and] its analysis ended at step one").

/////

Here, defendants move for summary judgment on plaintiff's § 1983 claim against Kemp-Williams for retaliation in violation of her First Amendment rights. (Doc. No. 39.) Defendants assert that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law because: (1) plaintiff did not engage in protected speech; (2) she did not speak as a private citizen; (3) her speech was not a substantial or motivating factor for the adverse employment action; and (4) Inyo County would have taken the same adverse employment action even absent the alleged protected speech. (Doc. No. 39-1 at 14.) Specifically, defendants argue that plaintiff's speech regarding the medical questionnaire and blood work and her complaints regarding Kemp-Williams' behavior and management style do not constitute speech on a matter of public concern. (Doc. No. 39-1 at 14–16.) Though defendants mention in their motion that plaintiff also alleges that she "reported her supervisor's alleged illegal behavior," defendants do not provide any argument on whether that speech is protected. (Doc. No. 39-1 at 14.)

In her opposition, plaintiff focuses solely on the second *Eng* factor and argues that she spoke as a private citizen because "[t]he duties of a government attorney do not include filing discrimination complaints against one's own employer, attending one's own disability accommodation meetings, or otherwise reporting violations of the law that your employer is committing." (Doc. No. 40 at 11.) Plaintiff does not mention any other *Eng* factor, does not rebut any of defendants' arguments, nor has she otherwise put forth any argument supporting the basis for her First Amendment retaliation claim.

The court will address the first *Eng* factor—whether plaintiff spoke on a matter of public concern—in the three categories of speech at issue here: (1) plaintiff's complaints about the medical questionnaire and blood work; (2) her complaints about Kemp-Williams' allegedly rude behavior and management style; and (3) her reports of Kemp-Williams allegedly illegal behavior. Because the court finds that none of plaintiff's speech was on a matter of public concern, the court does not address the other *Eng* factors.

The inquiry into whether a plaintiff spoke on a matter of public concern is purely a question of law. *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009). A public employee's speech is protected under the First Amendment if it addresses "a matter of legitimate public

12

concern," that is, "when it can be fairly considered to relate to any matter of political, social, or other concern to the community." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 571 (1968); *see also Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (The court must "determin[e] whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action"). "The [] emphasis . . . on the right of a public employee as a citizen in commenting upon matters of public concern [i]s not accidental" because "government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983). Thus, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147.

To assess whether the speech addressed a matter of public concern, this court must examine the content, form, and context of plaintiff's speech. *See Connick*, 461 U.S. at 148. The content of the speech at issue is the "greatest single factor" in the inquiry. *Demers v. Austin*, 746 F.3d 402, 415 (9th Cir. 2014). Speech that "enable[s] [] members of society to make informed decisions about the operation of their government" relates to a matter of public concern. *Desrochers*, 572 F.3d at 710 (9th Cir. 2009) (citation and internal quotation marks omitted). On the other hand, "speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." *Id.* (citation and internal quotation marks omitted). The Ninth Circuit has emphasized the Supreme Court's warning that speech "not otherwise of public concern does not attain that status because its subject matter could, *in different circumstances*, have been the topic of a communication to the public that might be of general interest." *Id.* at 717 (quoting *Connick*, 461 U.S. at 148 n.8). Thus, "the question is not whether particular subjects 'could be matters of public concern'; the question is whether 'this speech' meets the test." *Id.*

Courts must also consider the form of the speech at issue. That an employee expressed her views inside the office or privately, rather than publicly, "is not dispositive," but a "limited

13

audience weighs against [a] claim of protected speech." *Desrochers*, 572 F.3d at 714 (citation and internal quotation marks omitted); *see also Demers*, 746 F.3d at 416 (holding that, while not dispositive, "[i]f an employee expresses a grievance to a limited audience, such circulation can suggest a lack of public concern"). Thus, "[p]rivate speech motivated by an office grievance is less likely to convey the information that is a prerequisite for an informed electorate." *Desrochers*, 572 F.3d at 714 (citation and internal quotation marks omitted).

Lastly, courts "examine the context of the speech, particularly the *point* of the speech." *Id.* at 715 (citation and internal quotation marks omitted). "An employee's motivation [is] relevant to the public-concern inquiry." *Turner v. City and County of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015) (quoting *Desrochers*, 572 F.3d at 715). "The question of whether the speech was made to further some purely private interest is relevant to that inquiry." *Desrochers*, 572 F.3d at 715 (citation and internal quotation marks omitted). The Ninth Circuit has framed this inquiry with two questions: "[W]hy did the employee speak (as best as we can tell)? Does the speech 'seek to bring to light actual or potential wrongdoing or breach of public trust,' or is it animated instead by 'dissatisfaction' with one's employment situation?" *Desrochers*, 572 F.3d at 715 (quoting *Connick*, 461 U.S. at 148).

1.    <u>Plaintiff's Complaints about Medical Questionnaire and Blood Work</u>

As noted above, before accepting the job with Inyo County, plaintiff objected to the medical questionnaire and blood work portion of the Inyo County physical exam that she was

/////

/////

/////

/////

/////

/////

/////

/////

/////

14

asked to complete.[6]  Plaintiff advised Kemp-Williams that she had concerns about filling out the medical questionnaire, and Kemp-Williams told her she did not have to complete it.  She also texted Kemp-Williams regarding her concerns about the blood work, and was directed to call Ms. Dishion, who told plaintiff that she also did not need to complete the blood work.  After plaintiff was told that she did not need to complete either the questionnaire or the blood work, she accepted Inyo County's job offer and never voiced any further concerns about either issue.

First, as to content, even viewing the evidence in the light most favorable to plaintiff on summary judgment,[7] her objections to the medical questionnaire and blood work do not relate to any matter of "political, social, or other concern to the community."  *See Turner*, 788 F.3d 1206, 1211 (9th Cir. 2015).  Plaintiff's objections to the medical questionnaire and blood work were based on her own perception that requiring them was not legal.  At first blush, this may sound like

---

[6]  The court pauses to note that at the time plaintiff spoke about the medical questionnaire and blood work, she was not yet an employee of Inyo County, and thus was not a "public employee." Neither party raised this issue or addressed the significance of plaintiff's employment status at the time she engaged in this speech, even in their arguments related to the second *Eng* factor of whether plaintiff spoke as a private citizen or as a public employee.  Because the court finds that the content, form, and context of plaintiff's speech regarding the medical questionnaire and blood work do not support a finding that plaintiff spoke on a matter of public concern, the court does not address the other *Eng* factors.  Thus, the court need not, and does not, decide the issue of whether plaintiff could maintain her First Amendment retaliation claim based on speech made before she even was a public employee—an issue that appears to be of first impression.  *Cf. Loguidice v. McTiernan*, No. 1:14-cv-1323-TJM-CFH, 2019 WL 4222496, at *10 (N.D.N.Y. Sept. 5, 2019) ("The parties have not pointed the Court to any cases where a public employee began her speech while a private citizen, continued the matter as a public employee, and then suffered an adverse employment action allegedly motivated by her speech while working as a public employee.  The Court has likewise not discovered such a case.  The Court concludes that Plaintiff spoke as a private citizen when she filed her lawsuit.  There can be no doubt as to that fact, since she was not a public employee at that point.").

[7]  Though not addressed in either parties' statement of undisputed facts, plaintiff declares that she objected to the medical questionnaire and blood work because they were "unduly invasive of [her] personal privacy, in violation of the Fourteenth Amendment (incorporating the protections of the First Amendment) of the United States Constitution, as well as California law, and thus illegal," and that she discussed her concerns with Kemp-Williams and Ms. Dishion.  (Doc. No. 40-3 at ¶ 1.)  Ms. Dishion, on the other hand, declares that plaintiff "asked that she not have to complete the blood work due to it being repetitive to the urine sample she already provided." (Doc. No. 39-7 at ¶ 5.)  In any event, it is undisputed on summary judgment that after being told she did not need to complete the questionnaire and the blood work, plaintiff never voiced any further concerns about either issue.

the kind of subject matter that would be of public concern, particularly because courts have recognized "unlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern." *Thomas v. City of Beaverton*, 379 F.3d 802, 806–07 (9th Cir. 2004) (holding that the district court erred in finding that a public employee did not speak on a matter of public concern when she expressed support for promoting a subordinate and refused to acquiesce in her supervisor's unlawful retaliatory treatment of that subordinate, who had previously sued the city for denying her promotion and the jury found she had been retaliated against for making complaints of racial discrimination); *see also Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995) (a county employee's accusations of mismanagement and possible criminal conduct by her supervisor constituted speech on matters of inherent public concern because that speech was about the misuse of public funds, wastefulness, and inefficiency in managing and operating government entities); *but see Turner*, 788 F.3d at 1211 (affirming the district court's determination that a city employee's speech to city officials "about what he perceived to be the unlawful hiring and use of temporary exempt employees in direct contravention of the city charter" was not protected speech, even though his complaint "ostensibly could invoke a matter of public concern, as it discusses civil service rules prescribed by local law"). But as the Ninth Circuit has warned, courts must evaluate the content of the speech that is actually spoken, not whether the topic of that speech could have been of general interest to the public "*in different circumstances*." *Desrochers*, 572 F.3d at 717. The Ninth Circuit's decision in *Turner* is instructive. There, it was determined that the employee's speech was not on a matter of public concern, despite having potentially significant implications, because his complaint "was focused on and driven by his internal grievance" and "arose primarily out of concerns for his own professional advancement." *Turner*, 788 F.3d at 1211; *see also Constantino v. S. Humboldt Unified Sch. Dist.*, No. 18-cv-02249-RMI, 2019 WL 201565, at *11 (N. D. Cal. Jan. 15, 2019) ("Speech such as this, which deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies, is generally not of public concern."). Similarly, here, plaintiff objected because the medical questionnaire and request for blood work violated her own personal privacy

rights in her view.  Plaintiff did not raise the issue of illegality in a general sense, but rather she "refused to answer the questionnaire or submit to the tests" because "they were unduly invasive of [her] personal privacy."  (Doc. No. 40-3 ¶ 1.)

Under these circumstances, the undersigned concludes on summary judgment that the content of plaintiff's speech regarding the medical questionnaire and the requested blood work does not support a finding that she spoke on a matter of public concern.  Even if this were a close case with marginal relation to matters of public concern—which it is not—the court's conclusion is further supported by the fact that plaintiff's speech was made because of her personal interest in wanting to be excused from having to complete the questionnaire and the blood work.  *See Johnson*, 48 F.3d at 425.[8]

Second, as to form, plaintiff expressed her concerns about the medical questionnaire and blood work directly to Kemp-Williams and only spoke to Ms. Dishion about her concerns after Kemp-Williams directed plaintiff to do so.  Thus, plaintiff spoke to a limited audience in private conversations.  While not dispositive, this factor weighs against a finding that plaintiff spoke on a matter of public concern.  *See Evans v. Meyer*, No. 3:14-cv-00103-MMD-WGC, 2016 WL 81251, at *5 (D. Nev. Jan. 7, 2016) ("The speech that Evans has identified exclusively took the form of written complaints to supervisors.  Speech in the form of internal employee grievances, rather than some sort of public statement, cuts against a finding of public concern.").

Third, as to context, plaintiff raised her concerns about the medical questionnaire and blood work in the context of her completing the Inyo County physical exam, which was a condition of her job offer.  Plaintiff's apparent motivation was to obtain approval from her prospective employer that she did not need to complete the medical questionnaire and blood work

---

[8] In *Johnson*, the Ninth Circuit provided the following guidance:

> In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern.

48 F.3d at 425.

portions of the physical exam.  This is evident by the undisputed fact that she never voiced any

concerns about either the medical questionnaire or the blood work after being told she did not

need to complete them.  If her motivation was to ensure that the County did not violate the law by

imposing these requirements on other prospective employees, or if she sought "to bring to light

actual or potential wrongdoing or breach of public trust," *see Desrochers*, 572 F.3d at 715, then

arguably she would not have dropped the issue after being told she did not need to complete the

questionnaire or the blood work, which satisfied her personal interest in avoiding those

requirements.  *See Taitai v. City of Port Hueneme*, No. 2:15-cv-04106-ODW (AJWx), 2015 WL

8334771, at *5 (C. D. Cal. Dec. 7, 2015) ("[W]hile Taitai questioned the City employee on

several topics that could possibly have an impact on the public's perception of the City's

unscrupulous hiring practices, it is clear that the conversation was motivated solely by Taitai's

interest in his personal rehire application.  This is insufficient to make out a First Amendment

retaliation claim.").  Thus, the context of plaintiff's speech indicates that she was motivated by

her personal interest, not the broader public interest, which also weighs against a finding that

plaintiff spoke on a matter of public concern.

Because the content, form, and context of plaintiff's objection to the medical

questionnaire and blood work all indicate that she did not speak on a matter of public concern, the

court concludes that plaintiff's First Amendment retaliation claim based on this speech fails as a

matter of law.

2.      Complaints about Kemp-Williams' Behavior and Management Style

In moving for summary judgment in their favor, defendants contend that plaintiff's

complaints to Ms. Dishion and Ms. Baker about Kemp-Williams' management style and behavior

constituted speech on her individual personnel disputes and grievances, not speech on matters of

public concern.  (Doc. No. 39-1 at 15–16.)  Plaintiff makes no argument in her opposition that she

spoke on a matter of public concern when she made these complaints.  Instead, she merely offers

her own declaration which largely repackages verbatim the allegations from her complaint:  that

Kemp-Williams was rude, condescending, and overbearing and insisted on contacting her after

/////

hours without compensatory time off or other renumeration.  (*Compare* Doc. No. 17 at ¶¶ 16, 17 *with* Doc. No. 40-3 at ¶¶ 4, 5.)

The content, form, and context of this speech all support a finding that plaintiff did not speak on a matter of public concern when she complained about Kemp-Williams' rude behavior and management style.

As to content, plaintiff's emails to Ms. Dishion and Ms. Baker outline her problems and complaints with Kemp-Williams' management style and personality, all of which relate solely to plaintiff's grievances about Kemp-Williams' behavior towards her.  For example, plaintiff complained that:  Kemp-Williams was angry with plaintiff for taking sick time; she repeatedly called plaintiff "Juliet" instead of her name "Julia"; she brought up past issues to prove plaintiff was wrong; she said plaintiff's time management strategies were not working and plaintiff needed to slow down; she told plaintiff not to cross-work on assignments; Kemp-Williams' behavior was exacerbating plaintiff's headaches; and Kemp-Williams used a patronizing tone of voice.  (*See* Doc. No. 39-8 at 64–73.)  Thus, plaintiff's speech dealt with her own "individual personnel disputes and grievances" with Kemp-Williams; it was not speech that would be relevant to the public's evaluation of the performance of Inyo County.  *See Desrochers*, 572 F.3d at 710.

As to form and context, plaintiff expressed her concerns to a limited audience of Ms. Dishion and Ms. Baker through emails and at private meetings with them.  It is undisputed that Inyo County responded by commencing an investigation into plaintiff's complaints, separating the work locations of plaintiff and Kemp-Williams during that investigation, and ensuring that plaintiff was provided all the accommodations she requested related to her headaches.  The court finds that under these circumstances established by the undisputed evidence submitted on summary judgment, plaintiff's complaints about Kemp-Williams' behavior and management style constituted the type of personnel disputes that fall outside of First Amendment protection.  *See Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir. 1989) ("[S]peech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of 'public concern.'"); *Roe v. City & County of S.F.*, 109 F.3d 578, 585 (9th Cir. 1997) (finding no First Amendment protected speech

when plaintiffs "believed their supervisor was a 'micro-manager,' 'autocratic' and 'controlling,' or even that he dressed them down in front of their colleagues").

Accordingly, the court finds that plaintiff's speech regarding Kemp-Williams' alleged behavior and management style did not address a matter of public concern, and thus was not protected speech.

### 3. Complaints that Kemp-Williams' Behavior was Illegal

It is undisputed that plaintiff believed Kemp-Williams was violating the law. (PSUF ¶ 5.) Though the parties do not state any undisputed facts that describe plaintiff's speech addressing the alleged illegality of Kemp-Williams' actions, it appears from plaintiff's declaration submitted in opposition to summary judgment that she believed Kemp-Williams' behavior and management style toward plaintiff—specifically her being rude, condescending, and overbearing, her insisting that plaintiff work after hours without additional compensation, and her telling plaintiff that she resented employees taking sick time—violated the County's workplace policies, the Fair Labor Standards Act, the Fair Employment and Housing Act, and the Americans with Disabilities Act. (Doc. No. 40-3 at ¶¶ 4–9.) Plaintiff reported her belief that Kemp-Williams' actions were "illegal in nature" to Ms. Dishion. (Doc. No. 40-3 at ¶¶ 5, 6, 9.) At her meeting with Ms. Dishion and Ms. Baker on May 14, 2015, plaintiff reported her belief that Kemp-Williams had violated the FEHA, ADA, FSLA, "and was otherwise harassing and retaliating against [her] for [her] earlier complaints." (Doc. No. 40-3 at ¶ 9.)

In moving for summary judgment in their favor, defendants do not specifically address the "illegality" aspect of plaintiff's complaints about Kemp-Williams' actions. Before addressing each element of plaintiff's First Amendment claim in their motion, defendants state that "[p]laintiff alleges that she spoke about the illegality of the County's medical questionnaire and blood work request, as well as reported her supervisor's alleged illegal behavior." (Doc. No. 39-1 at 14.) Defendants then argue that plaintiff did not engage in protected speech in two sub-sections of their motion, first on the medical questionnaire and blood work and second on plaintiff's "HR Complaint Against Ms. Kemp-Williams," with the latter focusing solely on the management style and personality aspects of plaintiff's complaints about Kemp-Williams'

actions—not the alleged illegality of her actions.  (Doc. No. 39-1 at 15–16.)  While the court recognizes that plaintiff's reports of the alleged illegality of Kemp-Williams' actions were part and parcel of plaintiff's speech regarding Kemp-Williams' behavior and management style, the court addresses each of these aspects of the speech at issue separately because introducing notions of "illegality" and "unlawfulness" can impact the analysis of whether the speech in question is on a matter of public concern.  *See Thomas*, 379 F.3d at 806–07.

On plaintiff's part, her opposition is silent on the question of whether her complaints about Kemp-Williams' allegedly illegal actions constitute speech on a matter of public concern. As mentioned above, plaintiff's opposition to defendants' arguments regarding her First Amendment claim only address the question of whether plaintiff spoke as a private citizen and do not address any other factor.  (Doc. No. 40 at 11–12.)  Even on that narrow issue, plaintiff argues that she was speaking as a private citizen because "the duties of a government attorney do not include filing discrimination complaints against one's own employer, attending one's own disability accommodation meetings, or otherwise reporting violations of the law that [one's] own employer is committing."  (Doc. No. 40 at 11.)

It follows that to the extent plaintiff raised concerns about the alleged illegality of her supervisor's behavior, she did so only in the context of *her own* personnel dispute and how *she* was being treated by her supervisor—which in her view, was unlawful treatment.  Courts have held that that kind of speech is not protected.  *See Connick*, 461 U.S. at 147 ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."); *Thomas*, 379 F.3d at 808 (noting "the type of personnel matters that we have deemed unprotected under the public concern test are employment grievances in which the employee is complaining about her *own* job treatment, not personnel matters pertaining to others").  Thus, the content of plaintiff's speech—even with the aspect of perceived illegality as to how *she* was being treated—establishes that, here, plaintiff spoke on her individual personnel matter and not on a matter of public concern.

21

1    Moreover, the mere fact that plaintiff mentioned illegality in her discussion with Ms.

2    Dishion and Ms. Baker does not alter the court's analysis of the form and context of plaintiff's

3    complaints about Kemp-Williams, which the court determined did not support a finding that she

4    spoke on a matter of public concern. *See* Part A.2, above.

5        Accordingly, the undersigned concludes that plaintiff's speech regarding the alleged

6    illegality of Kemp-Williams' actions was not speech on a matter of public concern, and thus was

7    not protected speech.

8        Based on the undisputed evidence before the court on summary judgment as outlined

9    above, the court concludes that plaintiff did not speak on a matter of public concern with respect

10   to any of the categories of speech that form the basis of her First Amendment retaliation claim.

11   Thus, the court will grant summary judgment in favor of defendants as to that claim.

12   **B.      Plaintiff's FEHA Retaliation Claim**

13       California law prohibits retaliation by an employer against an employee. Specifically,

14   FEHA makes it unlawful for "[f]or any employer . . . to discharge, expel, or otherwise

15   discriminate against any person because the person has opposed any practices forbidden under

16   this [Act] or because the person has filed a complaint, testified, or assisted in any proceeding

17   under this [Act]." Cal. Gov't Code § 12940(h). A prima facie case of retaliation under FEHA

18   requires a plaintiff to show: (1) a protected activity; (2) an adverse employment action; and (3) a

19   causal link between the protected activity and the employer's action. *Yanowitz v. L'Oreal USA,*

20   *Inc.*, 36 Cal. 4th 1028, 1042 (2005); *Light v. Cal. Dep't of Parks and Recreation*, 14 Cal. App.

21   5th 75, 91 (2017); *Akers v. Cty. of San Diego*, 95 Cal. App. 4th 1441, 1454 (2002). An

22   individual engages in a "protected activity" when she "oppose[s] any practices forbidden under

23   [FEHA] or … file[s] a complaint, testifies[s], or assist[s] in any proceeding under the [FEHA]."

24   Cal. Gov. Code § 12940(h); *see also Yanowitz*, 36 Cal. 4th at 1042.

25       In considering FEHA retaliation claims, California courts apply the burden-shifting

26   analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See*

27   *Yanowitz*, 36 Cal. 4th at 1042. Under that analysis, once an employee establishes a prima facie

28   case of retaliation, the burden shifts to the employer to offer a legitimate, non-retaliatory reason

for the adverse employment action. *Id.*; *Light*, 14 Cal. App. 5th at 91; *Flores v. City of Westminister*, 873 F.3d 739, 750 (9th Cir. 2017). If the employer produces a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to prove intentional retaliation. *Id.* The plaintiff then has the burden to show "that the defendant's explanation is merely a pretext for impermissible retaliation." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001).

"Pretext may be shown either (1) directly by persuading the jury that a discriminatory motive more likely than not motivated the employer or (2) indirectly by showing that the employer's proffered explanation is unworthy of credence." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001). Under Ninth Circuit precedent, "[c]ircumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Brown v. City of Tucson*, 336 F.3d 1181, 1188 (9th Cir. 2003); *Godwin v. Hunt Wesson Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) ("Where evidence of pretext is circumstantial, rather than direct, the plaintiff must produce 'specific' and 'substantial' facts to create a triable issue of pretext."); *Gorrell v. Wells Fargo Bank, N.A.*, No. 14-cv-06811-AB (EX), 2015 WL 13721390, at *5 (C.D. Cal. June 25, 2015) (granting summary judgment for the defendant where plaintiff produced "no evidence that Wells Fargo terminated her for reasons other than her lack of compliance with company policy," and finding that "[s]olely relying on her declaration as her basis for retaliation does not create a triable issue of pretext for a jury to decide"). "Unsubstantiated assertions of retaliatory intent, without more, are insufficient to overcome the [employer's] proffered neutral reasons." *Munoz v. Mabus*, 630 F.3d 856, 865 (9th Cir. 2010) (affirming the granting of summary judgment in favor of a defendant repair shop on a technician's retaliation claim because the technician's unsubstantiated allegations that the shop had retaliatory motives in denying his requests for specialized training were insufficient to overcome the shop's evidence of legitimate, non-retaliatory, and non-discriminatory reasons). Finally, "[m]erely denying the credibility of the employer's proffered reasons is insufficient to withstand summary judgment." *Id.*

/////

23

Here, defendants have moved for summary judgment in their favor on plaintiff's FEHA retaliation claim against Inyo County. (Doc. No. 39 at 2.) In their motion, defendants contend that plaintiff has not met her initial burden of establishing the third element of her prima facie case—a causal link between her protected activity and Inyo County's adverse employment action. (Doc. No. 39 at 21–22.) Defendants also argue that even if plaintiff met her initial burden, plaintiff also has the burden to prove intentional retaliation because Inyo County has produced legitimate, non-retaliatory reasons for the adverse employment action taken against plaintiff. (Doc. No. 39-1 at 22–24.)[9]

In opposition, plaintiff addresses only the causal link element of her prima facie case. Specifically, plaintiff argues that "because she was fired only a few days after the conclusion of the investigative complaint of discrimination, etc., the close temporal proximity suggests a causal connection between her grievance and the fact that she was terminated." (Doc. No. 40 at 9.) Plaintiff asserts that "the short period of time between [her] complaint to human resources and the decision to fire her is sufficient to establish a prima facie case on summary judgment." (Doc. No. 10.)

But, it has been recognized that "a mere temporal relationship between an employee's protected activity and the adverse employment action, while sufficient for the plaintiff's prima facie case, cannot create a triable issue of fact if the employer offers a legitimate, nonretaliatory

---

[9] In their reply, defendants raise for the first time the contention that plaintiff has also not met the first element of her prima facie case—that she engaged in protected activity. (Doc. No. 41 at 5–6.) In this regard, defendants assert that plaintiff's opposition does not specifically state what protected activity she engaged in and that her references to "illegal" conduct are vague and do not clearly show how plaintiff's complaints about that "illegal" conduct were protected under FEHA. (Doc. No. 41 at 6.) But defendants did not move for summary judgment on this basis (*see* Doc. No. 39 at 2), and plaintiff's opposition reflects this by stating "[p]rongs one and two are not at issue. However, the Defendants dispute that there is a causal link between the adverse employment action and Langley's protected activity" (Doc. No. 40 at 9). The court will not consider this argument, which has been improperly raised by defendants for the first time in their reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("'[D]istrict court need not consider arguments raised for the first time in a reply brief."); *Van Scoy v. New Albertson's Inc*., No. 2:08-cv-02237-MCE-KJN, 2011 WL 13239542, at *1 (E.D. Cal. May 4, 2011) ("It is improper to introduce new facts and/or legal arguments for the first time by way of reply, as opposed to the initial moving papers.") (citing *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 894-95 (1990)).

reason for the adverse action." *Light*, 14 Cal. App. 5th at 94. Thus, a temporal relationship alone is not sufficient to avoid summary judgment. *Id.*

Notably, plaintiff does not argue that Inyo County has failed to articulate legitimate, nonretaliatory reasons for terminating plaintiff's employment, or even that there is a triable issue of fact as to whether Inyo County has satisfied their burden in this regard. Instead, plaintiff objects to certain portions of the declarations of Kemp-Williams, Mr. Carunchio, Ms. Baker, and Ms. Dishion, which defendants have offered as evidence on summary judgment to establish that Inyo County had legitimate, nonretaliatory reasons. (Doc. No. 40-4.) As to plaintiff's hearsay objections, while many of the declarants are relaying conversations in which other county employees complained to them about plaintiff's job performance, the court finds that those statements are not hearsay because they are not being offered to prove the truth of the matter asserted. Rather, they are offered to show the state of mind of the declarant. *See* Fed. R. Evid. 801(c). For example, plaintiff objects to Mr. Carunchio's statement that Ms. Williams worked with plaintiff on grant contracts and identified significant errors made by plaintiff in a grant contract, and she told him that "she felt like plaintiff was asking her to do legal work." (Doc. No. 41-3 at 5.) Defendants did not offer this statement to prove that plaintiff in fact made errors in the contract, or that she was in fact asking Ms. Williams to do legal work. (*Id.*) Rather, that statement is offered to explain Mr. Carunchio's state of mind, how that contributed to his decision-making, and whether he honestly believed his reasons for terminating plaintiff's employment. (*Id.*); *see Flanagan v. City of Richmond*, No. 14-cv-02714-EMC, 2015 WL 5964881, at *2 (N.D. Cal. Oct. 13, 2015), *aff'd*, 692 F. App'x 490 (9th Cir. 2017) (overruling evidentiary objection on hearsay grounds where the evidence was "not offered for the truth of the matters asserted, but to show the state of mind of the decision-makers who recommended termination"); *see also Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1063 (9th Cir. 2002) (noting that courts "only require that an employer honestly believed its reason for its actions, even if its reason is 'foolish or trivial or even baseless'" and "[i]n judging whether [defendant's] proffered justifications were 'false,' it is not important whether they were *objectively* false"). Moreover, plaintiff has not presented any evidence in opposition to the pending motion for

summary judgment that Mr. Carunchio did not honestly believe his proffered reasons.

Plaintiff also "denies" many of the facts that defendants listed in their separate statement of undisputed facts, but cites only her own declaration as evidence of the purported dispute. (Doc. No. 40-1.) Specifically, plaintiff cites these three paragraphs (which are verbatim allegations from the SAC):

> On or about March 6, 2015, I met with Human Resources/Personnel (HR) representative Sue Dishion to further explain my concerns about the actions of Defendant Kemp-Williams as well to report my belief that Defendant Kemp-Williams' actions were illegal in nature. Rather than meet with Human Resources/Personnel representatives and I to try to resolve my concerns, Defendant Kemp-Williams instead prepared a lengthy memorandum detailing her (Defendant Kemp-Williams') subjective perceptions about my alleged workplace deficiencies. Her assessment of my workplace performance was incorrect. Following the meeting, Defendant Kemp-Williams engaged in a series of outbursts while in the office. Those outbursts were directed at me and some of my co-workers.

(Doc. No. 40-3 at ¶ 6.)

> Defendants' allegations (both County of Inyo and Kemp-Williams) (to include the statement of Inyo County employees Dishion, Carunchio, and Baker) that I was somehow deficient in my work product (legal skills) are not correct. During the course of my employment with the County of Inyo, I performed my legal duties competently and in accordance with my experience as an attorney of many years.

(Doc. No. 40-3 at ¶ 15.)

> The allegations that I was "insubordinate" are false. I followed the lawful directions of my supervisor and client(s) that I was given to the best of my professional abilities.

(Doc. No. 40-3 at ¶ 16.)

But these averments do not materially dispute the existence of Kemp-Williams' March 6, 2015 and June 6, 2015 memorandums, or the fact that those memorandums listed concerns that Kemp-Williams and others identified with plaintiff's job performance. Plaintiff may very well deny the truth of the concerns identified, but her denial does not create a material issue of fact as to whether the memorandums exist. Similarly, plaintiff purports to dispute the list of reasons Mr. Carunchio declared to be the basis for his decision to terminate her employment, but she offers no

evidence on summary judgment that his "explanation is unworthy of credence." *See Winarto*, 274 F.3d at 1284. Thus, the court finds that Inyo County has articulated legitimate, non-retaliatory reasons as detailed in the factual background section above.

Having so found, the burden shifts to plaintiff to show that Inyo County's articulated reasons were pretextual and to prove intentional retaliation. Plaintiff, however, has failed to "produce 'specific' and 'substantial' facts to create a triable issue of pretext." *See Godwin*, 150 F.3d at 1220. Indeed, plaintiff has made no effort to meet this showing; she did not offer any evidence or provide the court with any predicate facts on which an inference of pretext can be drawn. At the hearing on defendants' pending motion for summary judgment, plaintiff's counsel confirmed that plaintiff has offered the court no evidence—besides temporal proximity and her own statement that she performed her duties competently—that would support her retaliation claim. Moreover, plaintiff's own declaration confirms that Kemp-Williams prepared the March 6, 2015 memorandum identifying plaintiff's deficiencies prior to plaintiff expressing her concerns about Kemp-Williams' behavior, thereby undercutting plaintiff's causal link and temporal proximity argument.

Because the court finds that on summary judgment Inyo County has articulated its legitimate, non-retaliatory reasons for terminating plaintiff's employment, and plaintiff failed to create a triable issue of fact as to whether Inyo County's reasons were pretextual, defendants are entitled to summary judgment on plaintiff's FEHA retaliation claim as well. *See Lavery-Petrash v. Sierra Nevada Mem'l Hosp.*, No. 2:11-cv-1520-GEB-DAD, 2015 WL 3733010, at *12 (E.D. Cal. June 12, 2015), *report and recommendation adopted*, No. 2:11-cv-1520-GEB-DAD, 2015 WL 13546452 (E.D. Cal. Aug. 7, 2015), *aff'd sub nom. Lavery-Petrash v. Catholic Healthcare W.*, 670 F. App'x 586 (9th Cir. 2016), *as amended* (May 16, 2017) (affirming summary judgment for defendant where defendant produced considerable evidence of plaintiff's poor work performance and behavioral problems and plaintiff's temporal proximity argument was insufficient to raise a genuine dispute of material fact as to pretext).

/////

/////

**CONCLUSION**

For the reasons set forth above:

1.    Defendant's motion for summary judgment (Doc. No. 39) is granted in its entirety; and

2.    The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **February 27, 2020**
_____
UNITED STATES DISTRICT JUDGE